Filed 9/11/25  P. v. Dominguez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

     Plaintiff and Respondent,

v.

JOSE DOMINGUEZ,

     Defendant and Appellant.

E081977

(Super.Ct.No. RIF2100982)

OPINION

APPEAL from the Superior Court of Riverside County.  Rene Navarro, Judge.  Affirmed.

Wallin & Klarich and Jonathan M. Lynn for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa A. Mandel and A. Natasha Cortina, Deputy Attorneys General, for Plaintiff and Respondent.

1

## INTRODUCTION

A jury convicted defendant and appellant Jose Dominguez of three counts of committing an aggravated lewd act against his stepdaughter when she was under the age of 14.  (Pen. Code, § 288, subd. (b)(1).)[1]  On appeal, Dominguez argues that:  (1) the trial court prejudicially erred by admitting expert testimony about child sexual abuse accommodation syndrome (CSAAS); (2) the record contains insufficient evidence to support a finding that he committed the lewd acts by force or duress; and (3) the prosecutor committed misconduct by improperly relying on the CSAAS testimony and by vouching for the victim.  We affirm.

## FACTUAL BACKGROUND

The victim, Jane Doe, was 12 years old at the time of the incident, living with her mother, two sisters, and stepfather, Dominguez, in a one-bedroom apartment.  Doe and her sisters slept in a bunkbed in the bedroom, and Dominguez and Doe's mother slept in the living room.  Early in the morning on September 29, 2020, after Doe's mother went to work, Dominguez entered the girls' bedroom, climbed into the bottom bunk where Doe was sleeping, and molested her.  As soon as Dominguez left the room, Doe woke her nine-year-old sister, E., and told her what had happened.  Later that day, Doe reported the abuse to her mother, who did not believe her and accused her of lying because Doe wanted Dominguez out of their apartment.

---

[1]  Unlabeled statutory citations refer to the Penal Code.

2

About two months later, Doe told E.'s biological father that her mother's boyfriend had molested her. E.'s father immediately called the police, and Doe and E. were scheduled for forensic interviews.

A. *The Investigation*

During her forensic interview, Doe said that, on the morning of the incident, she was sleeping alone in the bottom bunk of the bed while E. and her other sister shared the top bunk. Around 4:00 a.m., after her mother had left for work, Dominguez came into their room and got into bed with her. She was lying on her side facing the wall, and Dominguez was behind her. She woke up to the feeling of Dominguez rubbing his erect penis in between her buttocks over her shorts. When Dominguez tried to pull her shorts down, Doe feared that he was going to insert his penis into her anus. Doe told the examiner that she believed the reason Dominguez did not pull her shorts all the way down was because he was afraid of waking her up. Dominguez reached under her clothes and bra and played with her breasts. He also rubbed her vagina with both hands, touched the "middle" of her vagina with his fingers, and squeezed her buttocks under her underwear.

The way Dominguez touched her felt "weird" and "nasty"; but, she was afraid that if she said something, "he would hurt" me, so, instead, she began crying and thinking "please stop" in "my head." Doe said that Dominguez "just kept doing it until he wanted to stop," then he got out of the bed and went to the bathroom that was located inside the bedroom. She knew that it was Dominguez who had molested her because she could see him when the light in the bathroom was on.

3

Doe texted her mother after Dominguez left for work and asked her to come home during her lunch break because she had something "important" to tell her. When she told her mother what had happened, her mother "kept saying" that she had dreamed it. When Doe replied that she knew it was not a dream because she had stayed awake after it happened, Doe's mother said that probably a stranger had come in through the backdoor and molested Doe. Before going back to work, Doe's mother told Doe that she would place a camera at the backdoor and not to worry about it.

Doe said that she "stayed quiet" about the abuse "cuz since my mom didn't believe me I feel like no one else is gonna believe me." It made Doe sad that her mother did not do anything to protect her and "still doesn't believe me." Doe said that whenever she would remind her mother of what Dominguez did to her, her mother would get mad at her and hit her. Doe said that her mother would hit her sisters too but would hit her the hardest. Doe's mother hit her with hangers, belts, chargers, a fly swatter, and whatever was nearby. Doe would have marks on her skin after some of the beatings, and once she had a bruise on her back from when her mother hit her with a belt. Doe said that she heard her mother telling her grandmother "that I'm crazy. I'm bullshit. Um, I'm lying. I'm a liar, and I'm trying to get, I been tryin' to get rid of him, trying to get anything I want."

After staying quiet for two months, Doe told E.'s father about the abuse, and he cried then called the cops. At the end of the interview, Doe said that she was scared to go back home because she was afraid that her mother was going to hit her for "opening my mouth."

4

During her forensic interview, E. said that, on the morning of the incident, she heard the door creak, someone enter the room, and the bed on the bunk beneath her moving around "a lot." At some point later, the bathroom light came on, and she saw Dominguez come out of the bathroom. After Dominguez left the bedroom, Doe came up to E. and told her what happened. E. remembered that Doe was holding her waist, crying, and shaking in fear. E. asked Doe why she did not "smack" Dominguez, and Doe said because she was too scared. Doe asked E. what she should do, and E. said to tell their mother. E. also told Doe to take a bath, and afterward, as they waited for their mother to come home, E. stayed up with Doe and watched a movie with her "so nothing would happen to her" again.

When Doe told their mother what happened, their mother said that Doe must have been dreaming. Their mother also said that she, not Dominguez, had been the one touching Doe, because she wanted Doe to do the laundry. E. said that their mother told them not to tell anyone about the incident but that Doe told E.'s father "because [Doe] didn't want it to happen again."

The Riverside County District Attorney charged Dominguez with three counts of engaging in lewd conduct with Doe "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury" when she was under 14 years old. (§ 288, subd. (b)(1).)

B. *The Prosecution's Case*

Doe was 15 years old when she testified. Although her account of the incident at trial was not as detailed as the one she provided during her forensic examination, her

description of the abuse remained largely consistent. Doe said that Dominguez came into the bedroom early in the morning after her mother had left for work, got into the bottom bunk with her; touched her breasts, buttocks, and vagina, both over and under her clothes; tried unsuccessfully to pull her shorts down; and rubbed his erect penis against her buttocks. She said that she started crying during the incident because she was so afraid. She did not say anything to try to stop Dominguez because "I was too scared to." As she did during her forensic interview, Doe described telling E. about the abuse immediately after it happened.

Doe acknowledged that she had trouble remembering some of the details of that morning because she had "tried to forget." Doe also explained that she felt "very uncomfortable describing the stuff." For example, when the prosecutor asked her if it was Dominguez who molested her, Doe replied, "I think so. I didn't see his face." When the prosecutor showed her the part of the interview transcript where she said, " 'and I looked up like that, the light was on and I saw him right there,' " Doe responded that she did not see Dominguez's face in the light, but she saw his shirt and knew it was him. Doe said that she was telling the truth during the interview, even if she could not remember everything she said.

Doe said that her mother would hit her with "anything that is around," like belts and hangers, to the point that she bruised, and that her mother hit her every time she brought up the incident. She said that her mother still thought she was lying about the abuse, and that made her sad.

On cross-examination, defense counsel sought to impeach Doe with the inconsistencies between her interview statements and trial testimony.

E. testified as a witness for the prosecution but recanted. She said that she had been lying during her forensic interview to protect her sister. During her direct examination, she attempted to contradict or minimize her statements from the interview. For example, she questioned how Doe could have seen Dominguez in the bathroom right after the incident, stating, "there's a cabinet right there, so I don't know how she would have saw him." Ultimately, however, E. admitted that she had been worried about Doe on the morning of the incident. When the prosecutor asked why, E. replied, "Because she got touched"; and when the prosecutor followed up with, "And who touched her?" E. said, "Jose [Dominguez]."

Dr. Veronica Thomas, a clinical and forensic psychologist specializing in sexual offenses and abuse, provided expert testimony about CSAAS, which she defined as a pattern of behaviors that many children exhibit who have been sexually abused within an ongoing relationship. Dr. Thomas did not review any records or interview any witnesses in connection with the case; rather, she testified about how children respond to sexual abuse, in general. She said that CSAAS is not a "syndrome," as its name suggests, but rather a pattern. She explained that while that pattern can be helpful for understanding a child's reactions to abuse, CSAAS is not a diagnostic tool and cannot be used to determine whether or not sexual abuse occurred in a particular case. She explained that CSAAS addresses commonly held misconceptions about child sexual abuse, such as the stereotype of the child molester as a stranger. Instead, "what research indicates," is that

7

children "who are sexually abused are mostly abused by somebody that they know, and neither they nor the abuser may characterize or understand the nature of the interactions as abusive."

Dr. Thomas stated that there are five components of CSAAS: secrecy, helplessness, entrapment and accommodation, delayed or unconvincing disclosure, and recantation. Secrecy refers to an "agreement between the adult engaging in the conduct and the child to not tell anybody and it can be direct or indirect." Helplessness refers to the "psychological conundrum that a victim comes to when they realize" this "person's older and in authority. I'm a kid. Who is going to believe me?" Entrapment and accommodation refers to the "psychological way of rationalizing what is happening as being okay" because the child "is now feeling like they are involved in something and they don't really understand it, but they like it, but it's a secret."

Delayed or unconvincing disclosure refers to the fact that many child victims will choose to put up with the abuse for many years because disclosure risks upsetting family or other close group dynamics. When a child does disclose, a supportive reaction makes the child more willing to continue the disclosure whereas an unsupportive reaction makes the child less likely to report the abuse again. Dr. Thomas testified that "the research now suggests that a supportive female who is told first is more likely to result in a [future] report" from the child, and "an unsupportive female" makes future disclosure "less likely." Finally, recantation refers to the retraction or minimization of the abuse by the child when the child "recognize[s] that other people are now going to suffer for [their disclosure] and they may feel guilty and responsible for all of the changes that are going

on in the environment." As a result, "there may be a need, a desire, a feeling of guilt and responsibility on the part of the victim to try to put the toothpaste back in the tube and get things back to square one."

C. *The Defense Case*

Doe's mother's friend testified as a character witness for the defense. She said that she had known Dominguez since 2019, never saw him act inappropriately with a child, and would trust him to be home alone with her daughter.

Dominguez testified in his own defense and denied the allegations. He said that when he woke up at about 5:00 a.m. on the morning of the incident, Doe was in the living room, already awake, and when he left the apartment to go to work, he told her to fold the laundry. On cross-examination, he said that he did not get along with Doe as well as he did with her two younger sisters because Doe spoke English only and he spoke Spanish only. When the prosecutor asked how he was able to tell Doe to fold the laundry if they didn't speak the same language, he replied, "I don't want to talk to you anymore. You are confusing me." Dominguez said that he considered himself a father figure to his stepdaughters; however, he did not know their ages and did not know how to say his middle stepdaughter's name.

Doe's mother also testified for the defense. She too denied the allegations, stating that her daughter "has an issue with lying" and was lying about the incident. According to Doe's mother, it was she and not Dominguez who had touched Doe that morning. Doe's mother testified that E. normally slept on the bottom bunk with Doe, but when she went into the girls' room that morning before work, she did not see E. lying next to Doe.

9

She said that Doe was rolled up in the comforter "like a burrito" and that, in a "panic," she touched all over Doe's body searching for E., whom she finally found sleeping in the top bunk next to her other daughter.

Doe's mother claimed that she had touched Doe's breasts, buttocks, and vagina when she was searching for E., but she denied that she touched her in an inappropriate way and denied putting her hands under Doe's clothing. Doe's mother also testified that Doe had gotten the idea of being touched by Dominguez from a cartoon that she had watched, in which one of the characters was molested by their stepfather.

On cross-examination, Doe's mother admitted that she told Detective Ontko during the investigation that Doe had been menstruating on the day of the incident and that she had asked Doe whether she saw any blood on Dominguez's hands when he used the bathroom that morning. Doe's mother testified that she believed that Doe would have had blood in her underwear if Dominguez had touched her vagina, and that she had checked Doe's underwear after Doe reported the abuse and there was no blood in her underwear. Doe's mother also testified that she married Dominguez and had a child with him after Doe told her about the abuse.

The people called Detective Ontko as a rebuttal witness. The detective testified that, when she interviewed Doe's mother about the abuse, Doe's mother was "very defensive" and did not appear at all concerned for Doe's safety. The detective said that Doe's mother's testimony was inconsistent with her statements during her interview. During her interview, she had said that she found E. quickly (within a few seconds) in the top bunk, denied touching Doe's breasts or vagina while looking for E., never mentioned

10

touching Doe's buttocks, and also never mentioned that Doe had watched a cartoon where the character was molested by their stepfather.

D. *Verdict and Sentencing*

The jury convicted Dominguez of three counts of aggravated lewd conduct with a child under the age of 14. The trial court sentenced him to the midterm of eight years on count one and to concurrent eight-year terms on the remaining two counts. Dominguez timely appealed.

## DISCUSSION

A. *The CSAAS Testimony*

Dominguez argues that reversal is required because the trial court permitted Dr. Thomas to provide testimony regarding all five components of CSAAS when only some of those components were relevant to the circumstances of this case. He also argues that Dr. Thomas provided improper statistical evidence when she testified that most child sexual abuse victims are molested by someone they know. Acknowledging that he failed to object to Dr. Thomas's testimony during trial, he argues that his trial counsel rendered ineffective assistance. Dominguez's claim of ineffective assistance fails because both of his claims of error fail. (*People v. Anderson* (2001) 25 Cal.4th 543, 587 ["Counsel is not required to proffer futile objections."].)

"[I]t has long been held that in a judicial proceeding presenting the question whether a child has been sexually molested, CSAAS is admissible evidence for the limited purpose of disabusing the fact finder of common misconceptions it might have about how child victims react to sexual abuse." (*In re S.C.* (2006) 138 Cal.App.4th 396,

11

418.) In *People v. McAlpin* (1991) 53 Cal.3d 1289 (*McAlpin*), our Supreme Court stated that "expert testimony on common stress reactions of children who have been sexually molested"—including but not limited to "the child's failure to report, or delay in reporting, the abuse"—is "not admissible to prove that the complaining witness has in fact been sexually abused" but "*is* admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*Id.* at p. 1300, italics added.) As the Court explained: " 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior. [¶] The great majority of courts approve such expert rebuttal testimony.' " (*Id*. at p. 1301.)

At trial, Dr. Thomas provided testimony describing CSAAS and its five components, and she also told the jury that CSAAS was not a predicter of whether a child had been molested. This testimony was relevant and admissible because Doe delayed reporting the abuse for two months after her mother did not believe her; there were inconsistencies between Doe's statements during the interview and testimony at trial; and the defense attacked her credibility on those bases both during cross-examination and closing argument. Dr. Thomas testified that it is common for children who are sexually abused by people they know to delay disclosing the abuse, and that the child's reluctance to report increases if an initial disclosure is not believed. As our Supreme Court explained in *McAlpin*, expert testimony regarding patterns in how child victims respond

12

to sexual abuse is "clearly relevant" because it "tend[s] to rehabilitate the testimony" of the victim and explain behaviors that the jury may otherwise interpret as inconsistent with being a victim of abuse. (*McAlpin*, *supra*, 53 Cal.3d at p. 1302.) Furthermore, consistent with the principles set forth in *McAlpin*, Dr. Thomas's testimony was not used to "prove that the complaining witness has in fact been [sexually abused]." (*Id.* at p. 1300.) In fact, Dr. Thomas specifically testified that CSAAS is not a diagnostic tool and cannot be used to determine whether sexual abuse occurred in a particular case.

Dominguez argues that it was error for Dr. Thomas to describe the delayed discovery and secrecy components because those components were "untethered to specific case evidence." But the five components are necessary to define CSAAS for the jury, and Dr. Thomas's testimony about CSAAS was necessarily generalized because she did not know the specific facts of the case. Dominguez has identified no authority for the proposition that expert testimony on CSAAS must be limited to the components that appear in the case, and we are aware of none. To demonstrate error, appellant must present meaningful legal analysis supported by citations to authority. (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.) "When a point is asserted without argument and authority for the proposition, 'it is deemed to be without foundation and requires no discussion by the reviewing court.' " (*Ibid.*)

We also reject Dominguez's claim that Dr. Thomas provided improper statistical evidence. Relying on *People v. Julian* (2019) 34 Cal.App.5th 878, Dominguez argues that Dr. Thomas's statement that most children who are molested are molested by someone they know, constituted an "expert opinion[n] on the statistical probability of

13

guilt" similar to the testimony provided in that case. (*Id.* at p. 886.) But Dr. Thomas's remark was nothing like the barrage of data that the expert in *Julian* provided to the jury. In that case, the expert stated that false allegations by children " 'don't happen very often,' " and to support his point, he testified at length about several studies demonstrating that children rarely lie about sexual abuse. (*Id.* at p. 883-885.) For each study, the expert noted the percentage of allegations that were false and then summarized the studies by telling the jury that " '[t]he range of false allegations that are known to law enforcement or [child protective services] . . . is *about as low as one percent of cases* to a high of maybe 6, 7, 8 percent of cases that appear to be false allegations." (*Id.* at p. 885.) The court concluded that the expert's statistical evidence was improper because, by repeatedly conveying that false allegations " '*happen infrequently or rarely*,' " the evidence "invited jurors to presume [the defendant] was guilty based on statistical probabilities, and not decide the evidence properly introduced in the case." (*Id.* at p. 884, 886.)

By contrast, Dr. Thomas's statement was intended to disabuse the jury of the misconception that sexual abuse is more commonly perpetrated by a stranger. In *McAlpin*, our Supreme Court held that such testimony is proper. The Court explained that expert testimony conveying that "studies report that in most cases the child molester is not in fact a stranger to his victim" is relevant and admissible to rebut the "stereotype" of the child molester as a stranger. (*McAlpin*, *supra*, 53 Cal.3d at pp. 1303-1304.) We therefore reject Dominguez's claim that Dr. Thomas provided improper statistical evidence.

14

In any event, even if Dominguez could demonstrate error, he cannot demonstrate that the CSAAS evidence caused him to suffer prejudice. This is because the trial court instructed the jury with CALCRIM No. 1193, which provided that Dr. Thomas's testimony regarding CSAAS was "not evidence that the defendant committed any of the crimes charged against him" and that jurors could "consider this evidence only in deciding whether or not [Doe's] conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of her testimony." In addition, Dr. Thomas repeatedly qualified that CSAAS is not a predicter of whether any particular child has been sexually abused. She also qualified that not every child will follow the patterns identified by CSAAS, that "[e]very child is individual and different," and that the fact that the "research suggests" a certain pattern "doesn't make it absolute or true." In light of the jury instruction and Dr. Thomas's qualifying remarks, we conclude that there is no reasonable probability that the jury applied the CSAAS testimony as a predicter of Dominguez's guilt. Moreover, even if the jury had drawn an improper inference from the CSAAS evidence, it is not reasonably probable that the outcome of trial would have been different because the evidence of guilt was overwhelming. Doe's account remained consistent each time she told it, and E. corroborated that account by telling the examiner that she saw Dominguez use the bathroom in their bedroom after she heard someone come in the room and the bed creak a lot.

Finally, Dominguez asks us to revisit whether CSAAS testimony should be admissible to dispel misconceptions about how child victims react to sexual abuse. According to Dominguez, such misconceptions are no longer commonly held and, thus,

15

CSAAS testimony is unnecessary. That argument is better directed to the Legislature or to the California Supreme Court. We are bound by our high court's holding in *McAlpin* and see no reason to depart from it. (*AutoEquity Sales*, *Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455-456 ["The decisions of this court are binding upon and must be followed by all the state courts of California.]".)

B. *Sufficiency of the Evidence*

Dominguez argues that reversal is required because the record does not contain sufficient evidence that he accomplished the lewd acts by force or duress. The argument fails.

Section 288, subdivision (a), prohibits the commission of a lewd act on a child under age 14 done with the intent to arouse or satisfy the sexual desires of the perpetrator or the child. Section 288, subdivision (b)(1), further prohibits the commission of such an act "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person." Dominguez's claim of insufficient evidence necessarily fails because he does not challenge the sufficiency of the evidence supporting a finding that he accomplished the lewd acts by fear of immediate and unlawful bodily injury—which was the theory the prosecution used at trial. (See, e.g. *People v. Alexander* (2010) 49 Cal.4th 846, 922 [The defendant forfeited his claim "by not raising it . . . in his opening brief."].)

But even if Dominguez had raised such a challenge, it would be unsuccessful because the record contains ample evidence to support a finding of fear. "[T]he element of fear of immediate and unlawful bodily injury has two components, one subjective and

16

one objective." (*People v. Iniguez* (1994) 7 Cal.4th 847, 856 (*Iniguez*).) Doe's statement that she did not try to stop Dominguez because she was afraid that "he would hurt me" was sufficient to satisfy the subjective component. (See *id.* at pp. 857-858 [The victim's testimony that she did not resist the defendant because she was afraid that he would "do something violent" satisfied the subjective component.].) Doe's fear was objectively reasonable because "[s]udden, unconsented-to groping, disrobing, and ensuing sexual intercourse while one appears to lie sleeping is an appalling and intolerable invasion of one's personal autonomy that, in and of itself, would reasonably cause one to react with fear." (*Id.* at p. 858.)[2] We therefore conclude that the record contains substantial evidence that Dominguez accomplished the lewd acts by fear.

C. *Prosecutorial Misconduct*

Finally, Dominguez argues that the prosecutor committed misconduct during closing arguments. Acknowledging that he did not raise a misconduct objection in the trial court, he again argues that his trial counsel rendered ineffective assistance. We conclude that Dominguez has failed to demonstrate any misconduct.

---

[2] Our Supreme Court expounded on the element of fear in *Iniguez,* stating: "The Court of Appeal's suggestion that [the victim] could have stopped the sexual assault by screaming and thus eliciting [the] help [of someone nearby], disregards both the Legislature's 1980 elimination of the resistance requirement and our express language in *Barnes* upholding that amendment. ([Citation].) It effectively guarantees an attacker freedom to intimidate his victim and exploit any resulting reasonable fear so long as she neither struggles nor cries out. (See *People v. Bermudez*, *supra*, 157 Cal.App.3d at p. 624 [" 'The law has outgrown the resistance concept; a person demanding sexual favors can no longer rely on a position of strength which draws no physical or verbal protest.'] . . . There is no requirement that the victim say, 'I am afraid, please stop,' when it is the defendant who has created the circumstances that have so paralyzed the victim in fear and thereby submission." (*People v. Iniguez*, *supra*, 7 Cal.4th at pp. 858-859.)

A prosecutor's behavior rises to the level of misconduct under the federal Constitution only " 'when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214.)  Under state law, misconduct occurs only where it involves " ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*Id.* at p. 1215.)

"When a claim of misconduct is based on the prosecutor's comments before the jury, . . . ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " (*People v. Thompson* (2010) 49 Cal.4th 79, 127.)  We consider the remarks in the context of the whole argument and the instructions.  (*People v. Centeno, supra*, 60 Cal.4th at p. 667.) We do not "lightly infer that the prosecutor intended [her] remarks to have their most damaging meaning or that the jury drew that meaning rather than the less damaging one." (*People v. Howard* (1992) 1 Cal.4th 1132, 1192.)

Dominguez claims that the prosecutor committed misconduct in two ways.  First, he argues that the prosecutor "applied CSAAS factors to the facts of the case in an improper manner."  Dominguez has forfeited this argument by failing to develop it on appeal, as his opening brief does not identify the purportedly offending statement or statements from the prosecutor.  (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 ["An appellate court is not required to examine undeveloped claims, nor to make arguments for parties."].)  In any event, we have reviewed the prosecutor's closing statements and her brief references to CSAAS were proper.  The prosecutor used Dr.

Thomas's testimony that an unsupportive reaction can make a child victim of sexual abuse less likely to redisclose the abuse to argue that the jury could infer that Doe's mother's unsupportive response to Doe's initial disclosure caused Doe to delay reporting the abuse for another two months. Dr. Thomas did not apply the CSAAS factors to the specific facts of this case when providing her testimony; rather, the prosecutor employed Dr. Thomas's generalized testimony about reporting patterns to explain why Doe delayed reporting the abuse after her initial report to her mother. In other words, the prosecutor appropriately used the expert CSAAS testimony to rebut the common misconception that a victim of sexual abuse would immediately report the abuse. (See *McAlpin*, *supra*, 53 Cal.3d at p. 1301 [CSAAS expert testimony " 'is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' "].)

Second, Dominguez argues that the prosecutor improperly personally vouched for Doe when she argued during her closing statements that Doe had "zero motive to lie" because Doe did not stand to "get anything" from lying because she "was already getting her butt beat by her mom every time she brought it up," she "already wasn't believed," and her mother was still with Dominguez. " '[A] prosecutor is given wide latitude to vigorously argue his or her case' " (*People v. Dykes* (2009) 46 Cal.4th 731, 768) and " 'may make "assurances regarding the apparent honesty or reliability of" a witness "based on the 'facts of [the] record and the inferences reasonably drawn therefrom' " ' " (*People v. Redd* (2010) 48 Cal.4th 691, 740). "Improper vouching occurs when the prosecutor either (1) suggests that evidence not available to the jury supports the argument, or

19

(2) invokes his or her personal prestige or depth of experience, or the prestige or reputation of the office, in support of the argument." (*People v. Anderson* (2018) 5 Cal.5th 372, 415.)

Contrary to Dominguez's characterization, the prosecutor's argument regarding Doe's credibility was a fair commentary on the evidence. Nothing about the prosecutor's remarks conveyed that the prosecutor herself knew Doe to be an honest person. Rather, the prosecutor argued that the jury could infer from evidence in the record—that is, the evidence that Doe's mother did not believe her, hit her whenever she brought up the abuse, and stayed with Dominguez—that Doe stood to gain nothing from lying.

For all of these reasons, we reject Dominguez's claim of prosecutorial misconduct.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS_____
J.

We concur:


RAMIREZ_____
P. J.


MENETREZ_____
J.

20